IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2004

## STATE OF TENNESSEE v. ANDRE BALDWIN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-13691     W. Otis Higgs, Jr., Judge**

_____

**No. W2003-02253-CCA-R3-CD  - Filed July 21, 2004**

_____

The Defendant, Andre Baldwin, was convicted by a jury of first degree premeditated murder.  The Defendant was subsequently sentenced to serve a life sentence of imprisonment.  In this direct appeal, the Defendant challenges the sufficiency of the evidence.  Finding the evidence legally sufficient to support the Defendant's conviction, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Robert Felker and William Moore, Assistant Public Defenders, Memphis, Tennessee (at trial), and Garland Ergüden, Assistant Public Defender, Memphis, Tennessee (on appeal), for the appellant, Andre Baldwin.

Paul Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tom Hoover and David Zak, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Melissa Williams was married to the victim, Dewayne Williams.  Ms. Williams testified that she and her husband had just gotten home at about 4:30 p.m. on January 14, 2000.  They got out of their car and started walking toward their apartment when the Defendant approached them, telling the victim, "I need to holler at you a minute."  The victim responded, "man, don't approach me in front of my wife," and told Ms. Williams to go on into the apartment; she continued walking in that direction.  She heard the Defendant and the victim talking, but did not understand what they were saying until she heard the Defendant say, "Hey, man, you going to make me catch a murder charge."  Upon hearing that, Ms. Williams turned around and saw the Defendant with a gun in his hand.

According to Ms. Williams, the Defendant fired a shot into the ground. The victim turned to run, and the Defendant then shot the victim in the back of the leg. As her husband continued to run, Ms. Williams ran into her apartment to call the police. Ms. Williams heard a total of "several" shots fired over a short period of time. When she ran back outside, she found her husband lying face down on the pavement in front of the dumpster.

On cross-examination, Ms. Williams explained that her husband had told her earlier in the day that he and the Defendant had "got into it" because the Defendant had been "spreading a lie that could get somebody hurt." According to the victim, this rumor was that the victim was involved with someone else's girlfriend.

Nakeama Gregory was in the Williams' apartment when the shooting occurred. She testified that she saw the Defendant approach the victim and Ms. Williams and heard him call, "Dewayne." The victim stopped and turned around; Ms. Williams kept walking toward the apartment. As Ms. Williams was entering the door, Ms. Gregory heard a gunshot. She looked out and saw the Defendant pointing a gun toward the victim. She testified that she saw the victim "rushing towards [the Defendant], like he was trying to keep him from shooting again. And we heard another gunshot." At the second gunshot, Ms. Gregory explained, the victim "flinched and he looked down towards hi[m]self." During this time, she and others in the apartment were trying to keep Ms. Williams inside. Ms. Gregory stated that the victim "looked as if he was hurt. And he turned around, like he was going to run." When she next saw the victim, he was lying down in front of the dumpster. According to Ms. Gregory, the Defendant was standing at his side; the Defendant then shot "straight down" and ran off.

On cross-examination, Ms. Gregory stated that she heard a gunshot while the Defendant was standing over the victim, but was "not for sure how he aimed the gun." She stated that she heard a total of three gunshots, and that the Defendant and the victim had been "inches" apart from each other when the second shot was fired.

Terrance Bean was in a nearby apartment on the afternoon in question, playing cards with several other people. He testified that the Defendant walked in and stated that he was "tired of motherfuckers fucking with him." The Defendant was pacing the floor and looking out of the window. Mr. Bean saw a gun on the Defendant and told the Defendant that he didn't know what he was preparing to do, but "don't catch no charge." The Defendant was with the group for about ten minutes and then left.

After the Defendant left, Mr. Bean heard his brother say, "Fight!" Mr. Bean ran to the window and saw the Defendant and the victim. Mr. Bean testified that the victim had the Defendant "jacked up." According to Mr. Bean, "[the victim] pushed [the Defendant] off and [the Defendant] turned around and fired one shot in the air. When he turned back around, it was like [the victim] was coming towards him and he started shooting again." Mr. Bean saw the victim run, slip and fall. Mr. Bean also saw the Defendant run away. Mr. Bean told the police that he saw the Defendant shoot

the victim after the victim had fallen, but stated at trial, "But, you know, it happened so fast I really don't know."

On cross-examination, Mr. Bean retreated further, stating, "I did see [the Defendant] shooting but, you know, I don't know if [the victim] was on the ground or not when [the Defendant] still was shooting or whatever, I don't know." Mr. Bean explained that being "jacked up" was the equivalent of being roughed up. Mr. Bean stated that the victim was bigger than the Defendant. When the victim raised the Defendant up and pushed him off, the Defendant fired a single shot into the air. The Defendant was backing up so fast that he almost fell down. It looked as though the Defendant was trying to get away from the victim. Mr. Bean stated that approximately five shots were fired. According to Mr. Bean, after the first shot, "When [the Defendant] turned around, [the victim] was coming towards him and that's when [the Defendant] start just shooting."

On redirect, Mr. Bean acknowledged that, in his statement to the police, he said that the Defendant shot about three times, and the victim looked like he was trying to run, but fell beside the dumpster, at which point the Defendant fired two more shots at the victim.

Martha White was in the apartment with Mr. Bean when the Defendant came in. She testified that he looked "upset," "hyped," "jumpy," and was pacing the floor. The Defendant said that he was "tired of these motherfuckers messing with him." She saw a gun in the Defendant's waistband.

After the Defendant left, she looked out the window and saw the Defendant and the victim facing each other a few inches apart. She testified, "then [the Defendant] turned around and shot at -- shot the gun one time." At this point, the Defendant's back was to the victim. The Defendant then turned back around, the victim grabbed the Defendant's jacket, "[a]nd [the Defendant] start shooting." Ms. White heard the second shot while the gun was pointed toward the victim. The victim went toward the dumpster, and then returned. The Defendant started shooting again in the victim's direction as the victim was coming toward him. The victim then ran back around the dumpster and collapsed. The Defendant got in his car and left.

On cross-examination, Ms. White acknowledged having told the police that the Defendant had said that he was "tired of these motherfuckers putting their hands on me." She testified that this was an accurate reflection of what the Defendant had actually said. She explained that "putting their hands on" is the equivalent of hitting.

Sharon Furlong was in an upstairs apartment at the time of the shooting. She testified that she heard a single shot, followed by a pause, followed by three to five more shots. She stated that, after she heard the first shot, she went to the window and looked out. She testified, "And I seen two men standing beside -- near the dumpster. And they were facing each other. And there was three, four, maybe five more shots." She continued, "The person that got shot, I seen him grab himself and he stumbled back a little bit." She went outside and saw the victim lying face down on the ground.

Cathy Furlong, Sharon's mother, was with her daughter at the time of the shooting. They heard what they thought was a gunshot and went to the window to look out. Ms. Furlong testified, "We observed two men standing by the dumpster. We heard, like, three more shots. And then we -- I proceeded to go outside and the man [who had been shooting] ran past me." She saw the victim lying face down on the ground.

Dr. Cynthia Gardner performed the autopsy on Dewayne Williams. She testified that the victim suffered two gunshot wounds. One of the wounds was to the victim's left thigh. The bullet entered the outside left rear thigh and exited the left inner thigh, causing no life-threatening injury. The other bullet entered the victim's left back in the shoulder area and traveled through the victim's left lung, aorta, pulmonary artery and right lung. The bullet exited the victim's right front chest just above his nipple. This bullet was fired from a distance of more than two feet. Dr. Gardner testified that she was unable to determine which bullet was fired first.

Dr. Gardner explained that the victim would probably have had about fifteen seconds of consciousness remaining after being shot in the chest. Injuries to the victim's face and hands indicated that he fell forward to the pavement in an unchecked manner, as though he had already lost consciousness. The victim's injuries justified an inference that he did not move after he fell. The angle of the bullet wound to the victim's chest indicated that the only way he could have been shot while lying on the ground was if he were lying with his left side up.

Officer Douglas Barnes reported to the crime scene. There, he found a bullet hole in the ground near the area where the victim's car was parked. Officers recovered a bullet from this hole. The victim's car appeared to have been splashed with dirt and debris caused by this bullet hitting the ground. Another bullet was found when officers turned the victim's body over. Officer Barnes testified that "there was a bullet lying between [the victim's] clothing and his body that fell out . . . . A spent bullet, actual bullet."

Officer Dale Hensley also responded to the crime scene. There, officers looked for bullet strikes and other bullets around the body, but found none.

The Defendant turned himself into the police several days after the shooting, and Sergeant Daniel L. Barham took the Defendant's statement. After their initial conversation, Sgt. Barham had the Defendant repeat his statement while it was transcribed. The Defendant subsequently reviewed and signed this written statement, and a copy of it was provided to the jury. In this statement, the Defendant described the shooting and the events that led up to it as follows:

> At about 4 o'clock [the victim] pulled up on the side of my car that was parked in front of [the Defendant's girlfriend's] house on Longmont. I rolled my window down to see what he wanted and he said did I tell JJ he (Dewayne) was messing with his girlfriend. Dewayne said that the stuff could have got back to my wife and I said something like why do y'all always come to me, why y'all always bring this to me. He kept asking me did I tell JJ that and I said yes I did tell JJ that.

-4-

So he said well it could have got back to my wife and all this and he started talking crazy saying I will fuck you up, I will fuck you up and he walked around the car and pulled [the Defendant's girlfriend] out the car and then pulled me out the car and he got up some spit and spit in my face, jacked me over the door of my car and put me over the hood of my car and kept saying he would fuck me up, he would fuck me up and then he left. So I left and went up to Dale house and I sat down for a minute and I paced around and then I left and went to Hilldale and I went into Squeaky house and I was pacing around and I said I'm tired of folks messing with me, I don't know why people always do me like this.

That went on for about 2 or 3 minutes I think and then Dewayne and his wife pulled up and I walked over to him and I asked Dewayne can we talk. Dewayne stepped on my toe and then he said you ain't had enough, grabbed me by my arm, like pulling me over to the car and he jacked me up and he was like get your hands out your pocket. He had me jacked all up and I said man I just come over here to talk to you, that's all I come over here to do, to talk to you. I got away cause I kind of turned my back a little bit and I pulled the pistol out and I shot the pistol in the air and I said I come to talk to you how come you doing me like that, how come you treat me like a pussy? At that time I saw him run at me and I pointed down at his leg to shoot him in his leg and he kept coming so I kept shooting at his leg and I got scared and kept shooting at his leg. After that I just left and went and got in my car. I went to Timberlake. I parked my car on Hawkins Mill Road. I walked down to Dale house. I paced around for a while. I called a ride and Mark Brooks picked me up, took me over Toya Sanders house and that's where I stayed for about 4 or 5 days and I called to y'all office and turned myself in.

Elsewhere in his statement, the Defendant explained that he had purchased the gun about a week earlier, and gave it to someone to hide after the shooting. The gun was subsequently stolen from its hiding place and was not recovered during the investigation. The Defendant stated, "My intentions were to talk to [the victim] like a man, not to shoot him. The gun was just for my protection."

Sgt. Barham testified that, during their initial conversation, the Defendant told him that "while the victim was down, he [the Defendant] walked over on top of him and was still shooting." Sgt. Barham admitted that this conversation was not recorded in any fashion, and further admitted that he did not question the Defendant about this detail during the subsequent transcribed statement.

Tameka Gaither testified that she was the Defendant's girlfriend in January 2000. On the afternoon of the shooting, she was sitting in the car with him in front of her mother's house on Longmont. She stated that, while they were sitting there, the victim pulled up in a car and got out, coming over to the driver's side of their car where the Defendant was sitting. The victim started saying "mean words" to the Defendant. The victim tried to grab the Defendant out of the car, but the driver's door would not open. The victim then came over to the passenger side and grabbed Ms. Gaither's arm, trying to pull her out of the car. The Defendant told the victim to stop pulling on her.

The victim responded, "Nigger, I'll pull on you." Ms. Gaither then got out of the car, and the victim reached in and pulled the Defendant out. According to Ms. Gaither, the victim then "slammed" the Defendant against the car, hitting him and spitting on him. The Defendant did not fight back, and the victim eventually left. Ms. Gaither testified that the victim was bigger than the Defendant.

After this altercation, the Defendant told Ms. Gaither that he would be back, and got in his car and left. Ms. Gaither stated that the Defendant had tears in his eyes and was "scared and upset." She did not see him again that day.

On cross-examination, Ms. Gaither explained that other people had witnessed the episode, and that the Defendant had therefore been shamed.

The Defendant testified in his own defense. He explained that he had grown up and gone to school in Memphis, dropping out after ninth grade to join the Job Corps. He was thirty-two at the time of his trial. He had a single prior felony conviction, drug related, and had been released from prison for about a year in January 2000. He was unemployed in January 2000 and supporting himself through selling cocaine and marijuana.

The Defendant had known the victim for about a year. About a week prior to the shooting, he had had a fight with the victim. This previous fight was also about the Defendant telling a man called "JJ" that the victim was "messing with" JJ's girlfriend. The Defendant testified that he had, in fact, told JJ about the victim and JJ's girlfriend "because [he] was telling [his] friend that she was no good and he didn't need to mess with her no more." The victim got wind of the Defendant's conversation with JJ and accosted the Defendant on the steps of the Defendant's apartment. The victim asked the Defendant if the Defendant had told JJ that he was messing with JJ's girlfriend, and the Defendant denied it. Nevertheless, the victim "grabbed" the Defendant "a few times." The Defendant did not fight back because he was smaller than the victim and because the Defendant has a weak knee. The victim "rough[ed] [him] up pretty good" before the Defendant was able to leave.

The Defendant testified that he had another fight with the victim on the same topic on the afternoon of the shooting. The Defendant was sitting with his girlfriend in his car. The victim pulled up alongside, stopped his car, and got out. The Defendant rolled down his window to see what the victim wanted. The victim asked the Defendant if he had said anything to JJ about the victim messing with JJ's girlfriend. At this point, the Defendant admitted to having spoken to JJ. The victim then told the Defendant, "I'll fuck you up. I'll fuck you up." The Defendant described the victim as "Very mad." The victim reached in the Defendant's window, choked him for a few seconds, and tried to get the Defendant's door open. Because the door was damaged, it would not open. The victim walked over to the passenger side, pulled Ms. Gaither out of the car, and then reached in and pulled out the Defendant. The Defendant testified that he struggled with the victim, but the victim succeeded in pulling him out of the car, anyway. The Defendant testified:

> When he pulled me out the car, he spit in my face and then he just kind of like slammed, banged my head up against the car and slammed it against the car. And

> then he put me up over my door and put me up over the hood. So I was laying up over my door and the hood and he kind of slammed me.

The Defendant testified that he was "very afraid, scared, very nervous, didn't know what to do. Didn't know what to expect, what he was going to do." The attack continued for about two minutes, at which point the victim noticed some people standing around and watching. The victim then left.

The Defendant drove to a friend's house and tried to compose himself. He "couldn't get [him]self together," alternating between sitting down and pacing. He left the house and retrieved his gun from the trunk of his car. The Defendant testified that he got his gun out "for [his] protection and scared that [the victim] might have his gun. And [he] . . . wanted . . . to just make sure [the victim] just won't beat [him] up again in case [he] saw [the victim] again." The Defendant explained that he had seen the victim carrying a Glock 9 millimeter gun "all the time," although he had not seen it on the victim earlier that day. Indeed, the Defendant testified on direct examination that he could not remember the last time he had seen the victim with a gun. The Defendant stated that he put his gun on his side. He then left his friend's house and drove to another friend's apartment, which was in the same complex as the victim's. The Defendant stated that he wanted to talk to the victim to "get this behind us." He did not want the victim "to just pull up on side of me again and do the same thing he did."

When the Defendant initially arrived at the apartment complex where the victim lived, he was still emotional and crying. He described his emotional state as "nervous and scared." He sat in the parking lot for a couple of minutes trying to compose himself, and then put the gun in his pocket and walked to his friend's apartment. By this time, about thirty to forty minutes had elapsed since the victim had beaten him up.

The Defendant walked into his friend's apartment and found several people playing cards. One of them asked the Defendant what was wrong. He responded that he was tired of people putting their hands on him. He paced back and forth a few times between the window and the card table, and then saw the victim drive up. The Defendant walked out of the apartment intending to talk to the victim. As he left, he heard one of his friends tell him "don't do nothing or don't catch a charge or something like that."

The Defendant got to within about five feet of the victim and asked if he could talk to him. The Defendant had not pulled the gun out at this point. The Defendant testified that the victim's response was "he walked up to me and stepped on my toe, had his foot on my foot. And he grabbed me by the arm like this here. And he toted me like a little kid to the parking lot. And that's when he had jacked me up." As this was going on, the victim's wife was walking toward their apartment.

The victim asked the Defendant what he had in his pockets, and then placed his arm against the Defendant's throat while he patted the Defendant down. The victim pushed the Defendant against a car and slammed the Defendant's head against it. The Defendant struggled but could not get away. The victim then pushed him away and the Defendant turned his back, pulling the gun out

of his pocket and firing into the air. The Defendant testified that he shot the gun to keep the victim from beating him up again. At this point, he and the victim were about five feet apart.

The Defendant turned back around to face the victim and saw the victim running at him. The Defendant shot the victim in the leg "[b]ecause [he] didn't want to hurt him and didn't want to kill him." The Defendant continued:

> When I shot him . . . in his leg, he still got up on me and grabbed me by the time I like pushed him away. He stumbled to the -- he couldn't get his balance real good. So he stumbled to the parking lot. When he stumbled to the parking lot I backed up. He stumbled away. I say he had to have been like, I say around about 10 feet. He -- he fell down and he tried to get up. And he got like halfway up, but he fell back down. And then he got up again and he -- I think he fell down again. Then when he went to get back up again -- every time he got up, he kind of like tried to get towards that way where I was. But when he fell down again after he was trying to get up again, I shot back down in his legs [to] [k]eep from him getting at me.

The Defendant stated that the victim was looking at him during this struggle. The Defendant was scared, nervous, very afraid. After firing the final shot, the Defendant ran to his car and left.

The Defendant stated that he did not stand over the victim and fire at him, that he was some distance from the victim while he was shooting. He maintained that, other than when he shot into the air initially, he was at all times aiming at the victim's legs. He did not intend to shoot the victim in the back or chest. He turned himself into the police four or five days later because he "thought that would be the right thing to do," and because he was "very, very sorry that [he] had killed somebody and that [he] had shot a friend of [his]."

The Defendant acknowledged speaking to a police officer before his statement was transcribed, and flatly denied that he told the officer that he had fired shots while standing over the victim.

On cross-examination, the Defendant maintained that the victim was on the ground trying to get up when he shot him. The Defendant denied having shot the victim in the back as the victim tried to run away. The Defendant admitted to having purchased his pistol about a week previously and that it was loaded when he bought it. The Defendant thought it had five bullets in it. He bought it from someone on the street. It was a .38 chrome revolver with a brown handle and a four-inch barrel.

The Defendant also denied having said that he did not want "to catch a murder charge." He steadfastly maintained that he just wanted to talk to the victim. He testified that, when he left the scene, he did not know the victim was dead.

The State called Laquesha Wilson on rebuttal. She testified that the Defendant called her on the telephone about a year prior to the trial. He identified himself and stated that he knew she had

seen the victim with a gun before. She told him, "no." According to her, the Defendant then said, "I need someone to say that they seen [the victim] with a gun." She then hung up the phone.

After hearing this proof, the jury determined that the Defendant was guilty of the first degree premeditated murder of Dewayne Williams. The Defendant now challenges the jury's verdict on sufficiency grounds.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The Defendant was convicted of first degree murder, which is defined in pertinent part as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Id. § 39-13-202(d). Our statute further provides:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. A person kills another intentionally when it is the person's conscious objective or desire to engage in conduct that results in the victim's death. See id. § 39-11-302(a).

The Defendant acknowledges in his brief that his killing of the victim was "unlawful," but contends that the State failed to prove any crime greater than second degree murder, which is defined as the "knowing killing of another." See id. § 39-13-210(a)(1). In other words, the Defendant contends that the State failed to prove that he killed Dewayne Williams intentionally and with premeditation.

A defendant's state of mind at the time he or she commits a murder may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). "Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing." State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Circumstances that may warrant the trier of fact to infer premeditation include the defendant's procurement of a deadly weapon and the use of that deadly weapon on an unarmed victim. See id. at 615. The defendant's prior relationship with the victim whereby motive may be established is another circumstance from which the jury may infer premeditation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993). Shooting the victim after he turns to retreat or escape and failing to render aid to the victim are additional circumstances probative of premeditation. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). The infliction of multiple wounds followed by the destruction and/or secretion of evidence of the murder may also be indicative of premeditation. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

Viewing the evidence in the light most favorable to the State, as we are required to do, we find that the evidence is sufficient to support the jury's conclusion that the Defendant killed the victim intentionally and with premeditation. The proof established that the victim had twice previously assaulted the Defendant, the second time in front of the Defendant's girlfriend. Shortly after this encounter, the Defendant retrieved his pistol from the trunk of his car and placed it in his pants. The Defendant then drove to the apartment complex where he knew the victim lived. Stopping in to visit with his friends first, the Defendant expressed anger about the victim's assaults, telling his friends that he was "tired of these motherfuckers putting their hands on [him]." As soon as he saw the victim drive up, the Defendant left his friends, carrying his gun with him, and approached the victim. Knowing that he was armed, and knowing that the victim was angry at him, the Defendant taunted the victim, "Hey, man, you going to make me catch a murder charge." A struggle ensued, during which the Defendant pulled his gun and fired a warning shot, although he had not seen a gun on the victim earlier that day. The facts about what transpired next are controverted, but there is no question that the Defendant fired his gun again, this time aiming at the victim. Ms. Williams' testimony together with the physical and medical proof indicates that the Defendant probably shot the victim first in the leg, and it is significant that this shot entered from the rear of the victim's left thigh. The Defendant kept shooting. Another bullet entered the victim's back chest, causing massive internal injuries and leaving the victim only fifteen seconds of consciousness. The victim fell face-forward in such a way as to indicate that he had lost

-10-

consciousness prior to falling. The proof certainly supports the inference that the Defendant fired the fatal shot as the victim was trying to get away after having already been injured by a gunshot to the leg. After shooting the victim twice, the Defendant fled the scene. He then took measures to secrete the murder weapon. He did not surrender to the police for several days.

This evidence is more than sufficient to support the inference that the Defendant accosted the victim while fully prepared to shoot and kill him, and followed through on his plan when the victim responded angrily. The Defendant shot the victim twice, both shots entering from the rear. The Defendant admitted having aimed his gun at the victim. The Defendant shot at the victim multiple times, deliberately. The proof is sufficient to support the jury's conclusion that the killing was both intentional and premeditated. Accordingly, this issue is without merit.

We affirm the judgment of the trial court.

_____
DAVID H. WELLES, JUDGE